Andrew KONSTANTINIDIS, Libellant,

v.

**S. S. TARSUS, her engines, boilers, etc. and against Denizcilik Bankasi T.A.O., in a cause of contract civil and maritime, Respondent.**

United States District Court
S. D. New York.

May 20, 1965.

Hill, Rivkins Louis & Warburton, New York City, for libellant. Vincent J. Ryan, New York City, of counsel.

Lester M. Levin, New York City, for respondent. Richard Gyory, New York City, of counsel.

McLEAN, District Judge.

On June 16, 1961, libellant filed a libel in this court seeking damages in the amount of $1,660,000 for alleged breach of a charter party, dated September 1, 1959 and signed September 29, 1959, between respondent, a Turkish banking corporation, owner of the S.S. Tarsus, and libellant, a Turkish citizen, charterer of the vessel. The charter party was made in Turkey. It contained an arbitration clause providing for arbitration in Turkey of any dispute arising under it. The clause further provided that the Turkish laws should apply to the determination of the dispute.

On September 19, 1961, Judge MacMahon signed an order staying all proceedings "relating to the trial of this action" until "the arbitration has been had in accordance with the terms of the

charter party * * *." The stay is still in effect.

When the libel was filed, a writ of attachment was issued and served upon several New York banks in which respondent had accounts, thereby attaching respondent's property in the amount of $1,660,000. By order dated July 26, 1962, Judge Metzner directed that the attachment be released upon the posting by respondent of a bond in the sum of $250,-000. The bond was posted and the attachment was released. Judge Metzner's order was affirmed by the Court of Appeals on August 30, 1962. Konstantinidis v. Denizcilik Bankasi T.A.O., 307 F.2d 584 (2d Cir. 1962). The bond is still in effect.

Respondent now moves to dismiss the libel, and for an order pursuant to Admiralty Rule 8 terminating the security, on the ground that the arbitration has been had, that an award of the Turkish arbitrators in favor of libellant has been confirmed by the Turkish courts and paid by respondent, and that the controversy is therefore ended. In substance, respondent claims that because of these events occurring subsequent to the filing of the libel, the controversy has become moot and there is now nothing for this court to decide.

Respondent's claim of payment is based upon the contention that it paid the award, which was computed in Turkish liras, by depositing the amount of the award, less certain deductions, to the credit of libellant in the Central Bank of Turkey. At the time of the arbitration and of the award and the alleged payment, libellant was no longer in Turkey, but was residing in New York.

Voluminous affidavits and exhibits were submitted in support of and in opposition to respondent's motion, bristling with contradictory assertions as to the Turkish law and procedure. Libellant also claimed that respondent had bribed the Turkish arbitrators, and that in any event, the award was not yet final in Turkey despite several unsuccessful applications on his part to the Turkish courts to overturn it. I was of the opinion that questions of fact were raised which could not be determined upon affidavits. Accordingly, by memorandum dated December 18, 1964, I directed that a hearing be held on January 21, 1965, for the purpose of taking testimony on three issues: (1) whether payment by respondent to the Central Bank of Turkey constituted a valid payment and discharge under Turkish law, (2) whether, if so, the amount so paid by respondent was correct, and (3) whether the award was final under Turkish law.

A hearing was duly held and extensive testimony was taken. Although language difficulties, both with the witnesses and the documents, were not inconsiderable, I am satisfied, after seeing and hearing the witnesses and studying the documents, that the evidence is adequate to reveal the true factual situation. On the basis of the evidence adduced at the hearing, and also upon such of the material in the affidavits as is not disputed, I find the facts to be as follows: [1]

In 1961, pursuant to the charter party, each of the parties appointed an arbitrator to conduct the arbitration in Turkey of this controversy consisting of libellant's claims and certain counterclaims interposed by respondent. Each party

[1]. Some months before the hearing of January 21, libellant's counsel stated that he contemplated making a motion either to confirm or to vacate the arbitration award. I said that the motion might be referred to me, to be decided along with respondent's motion to dismiss. Libellant delayed making any such motion until the very eve of the hearing, more than a month after the filing of my memorandum of December 18, 1964 which defined the issues to be tried. By notice of motion returnable on January 19, 1965, li-
bellant moved for an order vacating the award, or in the alternative, modifying it and confirming it as modified. In so far as any exhibits attached to these motion papers were relevant to the issues tried at the hearing, they were introduced there. As I said at the conclusion of the hearing, I will not consider in determining these issues anything contained in these separate motion papers which was not introduced at the hearing, either by way of testimony or of documentary proof.

was represented by counsel. The proceedings commenced in November 1961. In June 1962 the two arbitrators concluded that they were unable to agree. Thereupon, pursuant to the charter party, they applied to the Fourth Commercial Court of Istanbul to appoint a third arbitrator. The court appointed the President of the Second Commercial Court. Libellant, through his Turkish attorney, consented to this. The three arbitrators continued their deliberations until December 28, 1962, when they announced to counsel for the respective parties that their decision of the case would be pronounced on January 7, 1963.

On January 7, 1963, the arbitrators met, together with counsel, for that purpose. The arbitrators then advised counsel that they had received a telegram from libellant sent from New York on January 5, 1963, and received by them on January 7, 1963, advising the arbitrators that libellant had dismissed his counsel and asserting that there was nobody to represent him and that accordingly, the arbitrators no longer had "jurisdictional authority." Libellant's counsel stated that he had not received any notice of his dismissal, but that in view of this telegram he would leave the meeting.

The arbitrators decided that this action of libellant was ineffective to deprive them of jurisdiction or to require the postponement of the announcement of their decision on this matter which had been under advisement for more than a year. Consequently, they proceeded to announce a summary of their award. It sustained libellant's claim in part, sustained respondent's counterclaim in part, and provided that the arbitrators', clerk's and lawyers' fees be borne by the parties "in proportion with justified and unjustified amounts."

The detailed award, in complete text, was published by the arbitrators shortly thereafter, dated as of January 7, 1963. It set forth their reasons for their decision in some 24 pages. It awarded to libellant TL [Turkish Liras] 1,350,000 on his claim, TL 1,130,000 of which was to bear interest at 10 per cent from November 9, 1961. It awarded to respondent TL 40,000 on its counterclaim, to bear interest at 10 per cent from January 12, 1962. As to attorneys' fees, it directed respondent to pay to libellant his attorneys' fees in the amount of TL 70,380, and directed libellant to pay to respondent its attorneys' fees in the amount of TL 322,596.50. It directed that the fees of arbitrators and clerks and expenses of the arbitration aggregating TL 347,523.25 be paid one-fourth by respondent and three-fourths by libellant. It made the same division with respect to any court expenses to be incurred subsequently.

An authenticated copy of the award was sent to the Turkish Consul in New York for service upon libellant. On April 15, 1963, the Consul requested libellant to call at the Consulate to receive service. Libellant declined to do so, and instead engaged in correspondence with the Consul. He demanded that the award be served upon his present attorney in New York. The Consul declined to do so on the ground that this attorney had not appeared in the arbitration proceedings in Turkey and was not of record there as libellant's attorney in those proceedings. This attorney finally obtained a copy of the award from the Consul in August 1963, but by that time libellant's time to appeal from the award on the merits, under Turkish law, had long since expired.

On July 8, 1963, the Third Commercial Court of Istanbul, on respondent's application, "certified" the award, thereby making it legally enforceable in Turkey. Libellant meanwhile embarked upon a series of applications to the Turkish courts and appeals from unfavorable decisions which continued for more than a year. His attempts to upset the award and the certification thereof may be summarized as follows:

On September 10, 1963, he petitioned the Turkish Court of Appeal (Commercial Chamber) for permission to appeal from the arbitration award. On October 21, 1963 the Court took note of libellant's actions in dismissing his attorney and

in refusing to accept service of the award in New York and held that "the alloted period for appeal has expired." The permission to appeal was therefore denied "on grounds of prescription."

Nothing further occurred until April 1, 1964, when a new Turkish attorney for libellant, Mr. Osman Dervis Kuntman, obtained from the Commercial Court a copy of the arbitration award. On or about April 9, 1964, he petitioned the Court of Appeal in libellant's behalf for a reconsideration of the October 21, 1963 decision. On May 23, 1964, the Court of Appeal rejected this petition stating that "no necessity existed to reconsider the case, since a Court decision finalized by failure to appeal within the delay specified by law could not be reconsidered in its principal and its details."

On July 2, 1964 and July 25, 1964, Mr. Kuntman submitted two more petitions to the Court of Appeal, claiming that the Court had neglected to give full consideration to libellant's motions in the May 23, 1964 decision and asking that the award be invalidated on the ground that the third arbitrator, being a judge, was disqualified to act. On September 10, 1964, the Court once again refused to hear the appeal, stating that only one request for "redressing" could be submitted on the same decision, and:

" * * * the motion having been denied on grounds of prescription, it is impossible, under the circumstances, to consider the motion itself. Furthermore, all legal recourses having been exhausted, it is also impossible to consider the appointment of a judge as arbitrator."

Finally, on October 23, 1964, the Court of Appeal, in response to two more petitions submitted by Mr. Kuntman on October 17, 1964, rejected the two motions "on grounds of legal impossibility to reconsider the case."

■ The net result of all this litigation is that although the Turkish courts have never considered the merits of the award, because of libellant's initial failure to take a timely appeal, the Turkish courts have repeatedly declined to upset the award and the Court of Appeal of Turkey has determined that libellant has no further recourse in the Turkish courts. Libellant did not seriously question this conclusion at the hearing. I find that the award is final under Turkish law.

■ At various dates in 1962 and 1963, respondent paid to the arbitrators and to the arbitration clerk their fees and expenses aggregating TL 347,752.75 as fixed by the award. These are the payments which libellant claims were bribes. Testimony on this subject was taken at the hearing. Libellant has not proved his claim. I see no reason to believe that there was anything improper in these payments. I find as a fact that they were properly paid to the arbitrators and to the arbitration clerk pursuant to the terms of the award. As previously noted, the award charged three-fourths of these fees and expenses to libellant, hence three-fourths of the total was paid by respondent for libellant's account.

On October 26, 1960, respondent was served in Turkey with an attachment in a proceeding by the Tax Department of the Turkish Government against libellant to recover an indebtedness allegedly owing to the Turkish Government by libellant for income taxes and smuggling penalties for the years 1955–58. The attachment was in the amount of TL 1,947,620. It purported to attach the accounts of libellant and his wife at the respondent bank and "the installations and stocks aboard S/S TARSUS owned by them and claims due to them and arising from their activities in respect of the said ship."

■ I am not concerned, of course, with the validity of the Turkish Government's claims or with the litigation between libellant and the Turkish Government concerning them. The question is whether the attachment constituted a valid lien upon the sums due from respondent to libellant pursuant to the arbitration award rendered at a date subsequent to the date of the attachment. Respondent's Turkish law expert testified that it did constitute such a lien. I ac-

cept that testimony and so find. The attachment is still in effect.

On January 23, 1963, respondent was served with another attachment. This one was in the amount of TL 235,000, and was to secure a claim asserted against libellant by the attorney, Sami Akinci, whom libellant had discharged. Pursuant to Turkish procedure, respondent set aside this sum in an escrow account to hold subject to the attachment.

I turn now to the facts relating to respondent's claim of payment. Libellant was not in Turkey when the arbitrators' award was handed down, nor, as far as appears, has he been there since. It was thus impossible for respondent to pay the award to libellant in person in Turkey. Moreover, since respondent had been notified that libellant had discharged Akinci on January 7, 1963, respondent could not pay the award to him. Apparently libellant had other attorneys in Turkey representing him in various litigations there, including other wholly unrelated controversies with this respondent, litigation with the Turkish tax department, and an action which libellant instituted against the Turkish Foreign Minister. I find, however, that none of these attorneys or representatives was duly authorized and empowered by libellant to receive the proceeds of the arbitration award on his behalf.

It may be that under Turkish law and foreign exchange regulations then existing, it was theoretically possible for respondent to transmit to libellant in the United States the amount owed by respondent pursuant to the award, provided, however, that permission to do so be first obtained from the Turkish foreign exchange control authorities. Respondent did not apply for such permission, apparently considering it futile to do so. At the hearing respondent's witnesses, including the Financial Attache of the Turkish Embassy in Washington, testified that if the Bank had applied, permission would inevitably have been denied because of the existence of the Turkish Government attachment, if for no other reason. This seems reasonable to me.

I cannot conceive that the Turkish Government would have permitted respondent to pay the award outright to libellant in the United States, free and clear of the attachment which the government itself had levied on this debt in an amount in excess of the amount of the debt.

In March 1963, respondent applied to the Turkish foreign exchange control authorities (known as the Istanbul Exchange Directorate) for permission to pay the award into a blocked account in libellant's name in the Central Bank of Turkey. Permission was granted by permit or order dated March 28, 1963. Respondent thereupon paid into such a blocked account in the Central Bank the sum of TL 709,031.01. The receipt issued by the Bank to respondent indicated that the blocked account was still subject to the lien of the Turkish Government attachment. By cable dated April 11, 1963, respondent informed libellant that it had made this payment.

Respondent arrived at the figure of TL 709,031.01 by deducting from the net award in favor of libellant, including interest, (1) libellant's share, fixed by the award, of the arbitration fees and expenses; (2) libellant's share of the attorneys' fees, and (3) the amount of the Akinci attachment, TL 235,000, held by respondent in escrow as previously noted. The parties have stipulated that the mathematics of respondent's calculations were correct, except for one minor item of interest, as to which there was apparently an error in computation. The discrepancy, according to libellant, amounts to TL 6,889.95, equivalent to $765.55. For the purposes of this case, respondent concedes libellant's figures as to this item. As far as the legal effect of the payment into the blocked account is concerned, the fact that this error in calculation was made is *de minimis* and will be disregarded.

By letter dated June 28, 1962, from libellant to respondent, libellant authorized respondent to pay his share of the arbitrators' fees and expenses for his account and to charge it against any sums which might become due to him under

the forthcoming award. Libellant admits that he signed this letter and delivered it to his attorney. He claims, however, that for some reason, the letter is "void." His testimony on this subject was so confused as to be unintelligible, and I do not credit it. I find that respondent was authorized by libellant to pay libellant's share of the arbitration fees and expenses and to charge it against the amount otherwise due him from respondent.

■ The letter does not refer to attorneys' fees. These fees, however, were just as much a part of the award as the damages. It appears to be the Turkish procedure in arbitration to apportion attorneys' fees in accordance with the extent of a party's success in establishing his claim. Since libellant's claim as originally submitted to the arbitrators far exceeded the amount to which the arbitrators ultimately found him to be entitled, the arbitrators required him to pay the greater part of the combined attorneys' fees of both parties. It was thus proper for respondent to take this into account in computing the amount due, just as it took into account the amount awarded it on its counterclaim. No separate authorization from libellant was necessary.

I find, therefore, that, apart from the minor error as to interest, respondent paid into the blocked account the full amount to which libellant was entitled under the arbitrators' award.

There was considerable argument as to whether the blocking of these funds was required by the Turkish law and currency regulations, and extensive testimony with regard to these regulations was offered. Each side called an expert on the Turkish law. In addition, respondent called the Financial Attache of the Turkish Embassy, and the general counsel of respondent also testified on the subject. It is not necessary to discuss all

this testimony in detail. The upshot of it is as follows:

There was in effect in Turkey in March 1963 an exchange regulation known as Decree 17 on the Protection of the Value of the Turkish Currency, promulgated by the Council of Ministers pursuant to power given it by statute. Article 42 of this decree stated that certain "items" owned in Turkey by persons residing abroad were "blocked." The list of "items" so blocked concluded with the broad phrase "and any other types of assets, rights, and receivables in Turkish currency." [2]

A later communique from the Ministry of Finance, dated February 13, 1963, repeated this language and proceeded to make certain specific "exceptions from blockage," none of which seems applicable here. Article 53 of this communique provided that "persons in Turkey who collect the assets, rights and receivables of any kind * * * belonging to real persons * * * residing abroad are under obligation to have them blocked." Article 54 provided that funds of nonresidents, including "their assets, rights and receivables of any kind in Turkey expressed in Turkish currency," should be paid into a blocked account in the Central Bank of Turkey, such account to be opened with the permission of the regional office of the exchange agency.

■ The sum payable to libellant under the award was a "receivable in Turkish currency." Libellant was a non-resident of Turkey. It seems clear, therefore, that payment of the award was blocked by Decree 17, and that the directive of February 13, 1963 required that it be paid into a blocked account in the Central Bank. Who was to make this payment? Under Article 53 of the Directive of February 13, 1963, as translated, it was to be made by the person in Turkey who "collects the * * * receivables."

2. One of the difficult features of this case was the frequent disagreement between counsel as to the correct translation of the various Turkish documents. I finally directed that a wholly disinterested interpreter be provided, not only to interpret the testimony of the witnesses, but also to translate the documents. Such an interpreter was provided. I have accepted his translations throughout as being the best available under the circumstances.

Literally this would mean that the receivable is not to be paid into the blocked account until after it has been collected from the debtor. Since, by hypothesis, the creditor is a non-resident and is not in Turkey to collect his receivable, this construction does not make sense. In this case I have learned to be skeptical of the accuracy of translations. The Turkish exchange control authorities obviously were of the opinion that respondent, who owed the money under the award, was a proper person to apply for leave to pay it into a blocked account. Otherwise they would not have granted respondent permission to do so. To permit the debtor to do this would appear to be in harmony with the fundamental intent and purpose of exchange control. I find that respondent's payment of the award into the blocked account in the Central Bank was in conformity with the Turkish regulations.

Mention should also be made of still another communique, one dated November 13, 1962, with regard to "invisible transactions." This term was defined in the communique by the process of listing a number of different types of transactions, some of which are explicit enough, such as repair costs, transportation, expenses, etc. However, the list winds up with another vague phrase, "TRANS-ACTIONS OF A GENERAL CHAR-ACTER." Under this heading appears the following:

> "Payments of losses, damages, indemnities and stipulated penalties arising from commercial transactions are subject to the permission of the foreign exchange agencies."

Respondent maintains that sums payable pursuant to arbitration awards are not included within this language. Libellant contends the contrary. To my mind it makes no difference which is right on this point, Even if it be assumed, for the sake of argument, that amounts payable under an arbitration award are "damages" or "indemnities," "arising from commercial transactions," the only effect of this directive of November 13, 1962 is to authorize the foreign exchange agency to make foreign exchange avail-

able for their payment if it sees fit. As I have previously noted, it is highly unlikely that any such permission would have been granted in this instance in view of the outstanding government attachment.

[7] Once the funds were paid into the blocked account, respondent lost all control over them. The funds became libellant's property. Under the regulations existing in March 1963, libellant, but for the attachment, could have drawn on these funds to pay obligations in Turkey. Any application to the authorities to free the funds became libellant's responsibility, not respondent's. Under these circumstances, I am prepared to accept the testimony that under Turkish law the payment into the blocked account constituted a valid and irrevocable discharge of respondent's obligation under the award.

I thus find in respondent's favor on the three factual issues. In summary, the facts are these. An arbitration award has been made in Turkey, under Turkish law, after an arbitration carried on there between Turkish citizens of controversies arising under a Turkish contract. As far as the evidence discloses, the arbitrators were not improperly influenced. That award is final in Turkey. The award has been paid by respondent in Turkey in a manner authorized by Turkish law.

What then, is to be done with the present action? Libellant contends that despite these facts the action should not be dismissed. His position is that this court should, on this state of facts, proceed to confirm the award and direct that it be satisfied out of the security in this court, i. e., the bond posted by respondent to discharge the attachment. Respondent points out that such a direction would require respondent to pay the award twice. Having already paid it in Turkish liras in Turkey, it would be compelled to pay it again in dollars in New York.

At the outset, it may be noted that some doubt exists as to the power of this court to confirm the award. The right to arbitrate is a substantive, not a proce-

dural right. Bernhardt v. Polygraphic Company, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

In Bernhardt, the Supreme Court expressly disapproved the principle announced in Murray Oil Products Co. v. Mitsui & Co., 146 F.2d 381 (2d Cir. 1944), that arbitration is "merely a form of trial." It could be argued that the federal statute creating the substantive right to arbitrate controversies involving maritime transactions does not apply to a maritime transaction as purely foreign as this one, i. e., an arbitration by Turkish citizens under a Turkish contract calling for arbitration in Turkey pursuant to Turkish laws. Cf. Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959).

Moreover, if it is assumed that the Act is generally applicable, a further question arises as to whether, under the Act, this court has power to confirm an award of foreign arbitrators made after an arbitration in a foreign country. Section 8 of the Act (9 U.S.C. § 8), it is true, provides that "[i]f the basis of jurisdiction be a cause of action otherwise justiciable in admiralty," the party claiming to be aggrieved may begin his proceeding by libel and "the court shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award." Literally, this confers upon the court the power to confirm regardless of where the arbitration takes place. If read literally, however, Section 8 seems inconsistent with many other sections of the Act which provide that it is the court for the district in which the arbitration takes place that has power to subpoena witnesses (9 U.S.C. § 7), confirm the award (9 U.S.C. § 9), vacate it (9 U.S.C. § 10), or modify it (9 U.S.C. § 11).

No controlling authority on this point has been discovered. In Danielsen v. Entre Rios Rys. Co., 22 F.2d 326 (D.Md. 1927), the court said that it had power to enter its decree on an arbitration award rendered in a foreign country. On the contrary, in The Silverbrook, 18 F.2d 144 (E.D.La.1927), the court said that it did

not have that power. And it has been held· that the court may not even direct that the foreign arbitration proceed, although it may stay the action until it does. International Refugee Organization v. Republic S.S. Corp., 93 F.Supp. 798 (D.Md.1950). See Fox v. Giuseppe Mazzini, 110 F.Supp. 212 (E.D.N.Y. 1953).

Murray Oil Products Co. v. Mitsui & Co., supra, relied upon by libellant, is of no assistance in this connection, for the arbitration there involved did not take place in a foreign country.

It is not necessary to decide these questions in order to dispose of the present case. Even if we assume that this court does have power to confirm the Turkish award and to direct that it be paid out of the property attached in this action, the question remains whether the court should exercise that power here. In my opinion it should not do so.

The award is final and binding upon the parties. It has determined the merits of their controversies. Albin Stevedore Company v. Central Rigging & Contracting Corp., 308 F.2d 347 (9th Cir. 1962); Rushton v. Howard Sober, Inc., 198 F. Supp. 337 (W.D.Mich.1961).

Moreover, the award has been paid. Respondent's obligation created by Turkish law has been discharged in accordance with Turkish law. That is an end of the matter. Respondent's debt has been discharged everywhere. Zimmermann v. Sutherland, 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034 (1927); Manasse v. Heine & Co., 188 Misc. 535, 68 N.Y.S.2d 494 (Sup.Ct.1947), aff'd, 273 App.Div. 853, 77 N.Y.S.2d 261 (1st Dept.), appeal denied, 297 N.Y. 1037, 79 N.E.2d 468 (1948).

■ When the claim which forms the basis of an action has been paid subsequent to the beginning of the suit, the action has become moot and must be dismissed. People of State of California v. San Pablo & Tulare R. Co., 149 U.S. 308, 13 S.Ct. 876, 37 L.Ed. 747 (1893).

It would be the height of injustice to require respondent to pay this debt a second time.

Pursuant to Admiralty Rule 46½, this opinion constitutes the court's findings of fact and conclusions of law.

Respondent's motion is therefore in all respects granted on condition that it pay $765.55 to libellant.

Settle order on notice.